Richard E. Beck v. Commissioner. Charlotte S. Beck v. Commissioner.
Beck v. Commissioner
Docket Nos. 15285, 15286.
United States Tax Court
1949 Tax Ct. Memo LEXIS 268; 8 T.C.M. (CCH) 126; T.C.M. (RIA) 49031; February 9, 1949
Allin H. Pierce, Esq., 135 So. LaSalle St., Chicago, Ill., for the petitioners. Charles D. Leist, Esq., for the respondent. DISNEY
Memoradum Findings of Fact and Opinion DISNEY, Judge: These cases, duly consolidated, involve income taxes for the calendar year 1943. Deficiencies were determined as follows: Docket No. 15285, $5,446.87; Docket No. 15286, $5,499.19. The question for consideration is whether a loss taken upon depreciation of real estate is ordinary or capital, which in turn depends upon whether the real property was used in petitioners' *269 trade or business and therefore was not a capital asset within section 117 (a) (1) of the Internal Revenue Code; and whether it was sold, or abandoned. From evidence adduced, we make the following Findings of Fact The Federal income tax returns involved were filed with the collector for the first district of Illinois. The petitioner Richard E. Beck is the step-son of Charlotte S. Beck, the widow of his father C. E. Beck, who died November 11, 1937. From C. E. Beck the petitioners inherited, in equal parts, a one-fourth interest each in property located at 5526-5532 South Shore Drive, at 55th and Lake Streets, Chicago, Illinois, the property as to which the loss herein is claimed (hereinafter called the Lake property). C. E. Beck and John E. Kernott had each owned a half interest therein. Kernott died about 1928, his interest passing to City National Bank of Chicago (hereinafter referred to as trustee or bank) as trustee for Doris Kernott. The lot has at all times been vacant, unimproved real property, with a frontage of 134 feet, overlooking Lake Michigan and separated therefrom by a city park. The depth of the lot is 300 feet. It is in a block which is zoned *270 against any commercial use except apartments or apartment hotels or hotels. At the time of trial, R. E. Beck had not been by the property in a year. The petitioners also inherited from C. E. Beck an income-producing property at Devon and Western Avenues, a ground lease on and building on a rental property in the Loop district, and a small piece of vacant undeveloped property at 89th and Halsted Streets, all of the above being in Chicago, Illinois; also some lots in St. Cloud, Florida, purchased for the purpose of building homes. The petitioners did not purchase or develop any of the above properties, except that in Florida, and did not, after C. E. Beck's death in 1937, develop any property in the Chicago area. C. E. Beck conducted his business under the name of C. E. Beck Enterprises, and for about a year after his death the petitioners used that name, but since have used the name R. E. Beck Enterprises. Richard E. Beck is manager, but both petitioners are equal owners. The business has principally been that of holding and managing real estate for rental and income purposes, the operation of some motion picture theatres, and a hog and cattle ranch in Florida, and some security *271 transactions. The executive office of the business, and of the theatre business, was, in general, maintained in downtown Chicago. An assistant to R. E. Beck maintains the office. About six book accounts were kept, of which one was known as Beck Properties. There was a separate bank account, with separate printed checks, for the Beck Properties account. The books were audited regularly by a firm of accountants. The Beck Properties account contained three or four pieces of real estate, including the Lake property, the others being inclued in those hereinabove listed as inherited by the petitioners. R. E. Beck does not speculate in "appreciative securities." The Lake property had been held by C. E. Beck (and Kernott) since about 1918, when it was acquired as part of a larger trust, by exchange of a piece of improved and rented commercial property. The adjusted basis of petitioners' half interest in the Lake property is agreed, and we find, to be $30,000. Prior to the death of C. E. Beck in 1937 effort was made by the owners through real estate brokers to sell the Lake property for about $75,000. The property was listed with a number of agencies at different times and at different *272 times different prices were asked. About November or December 1937 an offer of about $50,000 for the entire property was made and refused. The petitioners joined the trustee, immediately after inheriting their half interest in the property, in endeavoring to realize the highest available price for the property and authorized the trustee to represent them in such endeavors. The asking price was reduced to $60,000 in 1938. Thereafter the price was gradually reduced. It was at no time less than $30,000. The trustee and petitioners both tried to liquidate the property. The Lake property was never rented, or listed for rental. At one time the owners discovered that a part of the property was being used for a parking lot by a hotel. Continuation of such use was permitted, on condition that the user would look after the remaining portion, and keep up its appearance, but no consideration was received for the use. C. E. Beck had blue print plans made on two occasions for development of the Lake property after his death, and in 1938 R. E. Beck had plans drawn by an engineering firm for the purpose of an apartment project. He discussed the matter with a real estate firm, who proposed an apartment *273 building, also with another real estate man who rendered an opinion on the real estate firm's project. He also discussed thematter of costs and financing with a friend, a contractor on a large scale. Effort was made to mortgage the property, for financing a project, to an insurance company, but without success. The real estate firm's apartment proposal was rejected by R. E. Beck. A proposition for building row houses on the property was also considered in 1939 but nothing was done. A drive-in restaurant was considered but zoning ordinances prevented that project. The bank-trustee for the Kernott interest took the position that it could not go into development of the property. R. E. Beck on January 10, 1939, obtained from the trustee an option to purchase the Kernott interest for $30,000 by May 10, 1939. As the trustee could not under its powers, and would not participate in the development of an apartment building as proposed, the option was necessary. It was not exercised. The insurance company approached for a mortgage considered the project economically unsound. The war in Europe in 1940 and the entry by the United States in 1941 restricted chance for development. The taxes were *274 paid on the property up to and including 1939, by the petitioners and the trustee. Thereafter taxes for 1940, 1941 and 1942 were not paid, because of failure by petitioners to pay their part. They considered the taxes too high. R. E. Beck offered to sell his interest to the trustee for the amount of taxes, so that he could pay the taxes and take an income deduction, but the bank declined. He told the bank he would not continue to pay taxes. The petitioners' share of the taxes for 1940, 1941 and 1942 on the property was about $5,300. At one time, after R. E. Beck told the trustee that he was going to pay no more taxes, the trustee rejected a proposition to purchase the Beck interest for $11,000. The offer was reduced to $2,500, subject to taxes, and was later reduced to $1,500. Later R. E. Beck asked what the trustee would give for the property and was told a nominal consideration would be paid, that it would pay $100 for a deed. The trustee would have paid up to $500. On December 22, 1943, the bank-trustee, and the petitioners, entered into a written "Real Estate Sale Contract" providing, in pertinent part, that the trustee agreed to purchase and petitioners agreed to sell for *275 $100 the undivided one-half interest of petitioners in the property, by quit-claim deed, subject to all taxes and any fees or charges incurred for tax reductions effected or attempted on the property, the petitioners agreeing to furnish good and merchantable title, and payment of the $100 to be made within five days thereafter. On December 24, 1943, in Florida, the petitioners executed a quit-claim deed to the property to the trustee, reciting a "consideration" of "$10.00 and other good and valuable considerations." Documentary stamps in the amount of fifty-five cents were attached. The deed was acknowledged by petitioners on December 28, 1943, and recorded in Cook County, Illinois, on December 30, 1943. On December 24, 1943, the petitioners also assigned to the trustee their rights in any tax refunds from the property. Some tax experts had been employed and were attempting to adjust the taxes on a contingent basis. The trustee agreed with petitioners to pay the tax experts their fees. The petitioners each received $50 for the conveyance. All instruments were drawn by the trustee in conjunction with petitioners' attorney who examined them and presented them to petitioners for signature. *276 R. E. Beck had decided to abandon the property. The trustee had suggested the quit-claim deed and that it would pass $50 to each of the petitioners. The trustee regarded the acquisition of the property as a sale because it paid $100 for it, but did not consider it was paying $100 as the price of the property. It considered it was a purchase and was buying the property. The trustee paid up the taxes on the property, amounting to about $5,300, and penalties, and about July 1, 1944, sold the property for about $28,500. The asking price was $30,000. In income tax returns for 1943 each petitioner reported under "Net gain (or loss) from sale or exchange of property other than capital assets" a loss of $14,950, or one-half of $29,900, on land sold, acquired in 1937 by devise, with a basis of $30,000 and "gross sales price (contract price)" of $100. It is listed in the return under "Property other than Capital Assets." A sworn protest filed as to the years 1943 and 1944 by petitioners with the Internal Revenue Agent in Charge at Chicago, dated November 12, 1946, protesting against treatment of the loss here involved, as long-term capital loss instead of ordinary loss, contains, in *277 pertinent part, the following language: "When the taxpayers received their one-half interest in the land, they immediately joined with the City National Bank in endeavoring to realize the highest available amount, and authorized the bank to represent them in such endeavors. In 1938, the asking price of the total property was reduced to $60,000. In subsequent years, due to decline of the neighborhood, the asking price was further reduced from time to time. "The taxpayers determined in 1942, that due to the decline in the market value, and the expense involved, they would not pay any further real estate taxes on the property until such time as it was sold. The bank, in the meantime, continued to pay one-half of such taxes out of the funds of the Kernott Estate. By the end of 1943, the accumulated taxes and penalties and interest thereon was approximately $5,000. The bank was apprehensive about the back taxes which constituted a lien on their 1/2 interest as well as the taxpayers interest, and threatened to bring a partition suit. The taxpayers finally decided to sell out their one-half interest to the bank as Trustee of the Kernott Estate for the best price obtainable plus assumption *278 of taxes. The bank offered $100them for a quitclaim deed, which offer was accepted, and sale was made on December 30, 1943. This sale was a bona fide arm's-length transaction. The bank subsequently paid off the back taxes and was successful in disposing of the whole property in 1944. "The taxpayers suffered a loss of $29,900 on the sale to the bank, each claiming a deduction of one-half, or $14,950, on his 1943 income tax return. "The taxpayers never made any personal use of the property and at no time had any other interest therein than to dispose of it at the best available price. The taxpayers claim that their loss is fully deductible under Section 23 (e) of the Internal Revenue Code as a loss resulting from a transaction entered into for profit." In the determination of deficiency the Commissioner disallowed, as to each of the petitioners, deduction of $14,950 as "loss on sale of property other than a capital asset" and allowed a capital loss of $7,475, with the explanation that the loss suffered on the sale of the land at 5526-5532 South Shore Drive, Chicago, Illinois, was a long-term capital loss; and referred to section 117 of the Internal Revenue Code *279 . Opinion The petitioners' position is, in a word, that the property was not a capital asset because it was "real property used in the trade or business of the taxpayers" within the last clause of section 117 (a) (1) of the Internal Revenue Code, [1] and further that even if it was a capital asset, there was abandonment thereof, and no sale or exchange, therefore the loss taken was not limited by section 117 (b) which places a 50 per cent limitation upon loss or gain "recognized upon the sale or exchange of a capital asset," held for more than six months. The view includes the contention that section 117 (j) does not here apply, since the property here involved is "real property used in the trade or business held for more than six months which is not * * *" includible in inventory or held primarily for sale to customers in ordinary course of trade. *280 We will first consider the idea that there was abandonment and not sale; for, if there was, it would be immaterial whether the property was a capital asset. We hold that there was no abandonment. Though there was testimony from R. E. Beck and the representative of the bank attempting to establish abandonment, it can not prevail over the facts otherwise appearing. The petitioners' returns reported a sale for $100. That amount was received. The "Real Estate Sale Contract" describes a sale, the contract reciting that the bank agrees to purchase, and that the petitioners here agree to sell, the land involved; and in the quit-claim deed they convey it for a "consideration" recited as "Ten Dollars and other good and valuable considerations." In addition, the evidence is that R. E. Beck tried to obtain various prices for the land from the bank, from $11,000 down to $1,500, and later Beck asked what the bank would give. The protest sworn to by the petitioners on November 7, 1946, states that they finally decided to "sell" to the bank "for the best price obtainable plus assumption of the taxes." The bank offered them $100 for a quit-claim deed, which offer was accepted and sale was made on *281 December 30, 1943. These statements are flatly opposed to the contention now made as to evidence of abandonment. It is difficult, moreover, to conceive of abandonment when $100 consideration was received. In Commonwealth, Inc., 36 B.T.A. 850, $50 was paid and abandonment was found, but the $50 was for other property, recording fees and revenue stamps. The conveyance was to a mortgagee. We hold that there was here no abandonment, but sale. Was the property a capital asset? It is not if, within the latter part of section 117 (a) (1) of the Code, it is excepted from capital assets as "real property used in the trade or business of the taxpayer." It was within section 117 (g) held for more than six months, was not within section 117 (j) includible in inventory or held primarily for sale to customers in ordinary course of business, since the petitioners do not claim to have been, and were not, in the business of selling real estate. Our question, therefore, is, and is presented as: Was this real estate used in petitioners' business? It was not actually put to any use, in any ordinary sense, for it was vacant and unimproved. No rent was obtained from it at any time and a hotel *282 was allowed to use it as a parking space in consideration of keeping it cleaned up. The petitioners argue, nevertheless, that within the meaning of section 117 (a) (1) it was used in business, the argument in effect being that it was so used because the petitioners were in the business of developing property for rental purposes, and tried, though vainly, to develop this property for that purpose. We have carefully examined each of the cases relied on by the petitioners. We need not discuss them in detail for each, in our view, fails to support the petitioners' thesis here. Some involve merely abandonment, which we have above declined to find. Others arose prior to the amendment of section 117 in 1942 and are not on the point urged here. None involves, as here, mere inheritance of vacant real estate, non-user thereof by actual use or leasing to others, and later sale. Carter-Colton Cigar Co., 9 T.C. 219, comes nearest to the present situation, yet differs essentially from it, for there the petitioner, being in the tobacco distributing business, had use for and was leasing quarters for its warehouse and principal office, and acquired the property in question with the intent *283 and purpose of erecting thereon its own warehouse and store building, for occupation as its principal place of business. Because of death of one manager that purpose was abandoned, after plans and specifications had been proposed for erection of the building, and later the unimproved property was sold. Some slight income was received from the property, by leasing it for advertising space. We think acquisition of real estate for actual use as principal place of business, the beginning, by drawing of plans, of such use, and use of property for advertising space differs greatly from the situation here. It would be more analogous had the petitioners acquired the property for their principal office building and had they been in a business in which they needed such office or principal building. Here, however, the petitioners acquired, by inheritance, vacant property. Though inheritance has been called a neutral factor, it indicates here that the acquisition of the property was not because of its necessity in the business, as in the Carter-Colton case, supra. The inherited vacant property was never actually used at all. Montell Davis, 11 T.C. 538. Evidence indicates tentative *284 efforts to improve it for rental purposes. That, the petitioners say, was their business. Yet not only had this property long been held, both by them and their predecessor, unimproved and unrented, but no other property was improved by them. They received the rents from leases on the property at Western and Devon Avenues, and one at 6 South State Street. Though owning a location at 89th & Halsted Streets, they did not develop it or show reason why it was not developed, and no development of some lots in Florida is shown. Under these circumstances there is in our opinion, strain in the effort to show development of rental property to be the business of the petitioners. They were, rather, merely holding inherited property, hoping to sell it. This conclusion is consistent with the sworn statement of both the petitioners in their protest, as late as November 17, 1946, wherein they affirmed that when they received the property they immediately tried to sell, and continued so to do; that they never made any personal use of the property; and that they "at no time had any other interest therein than to dispose of it at the best available price." We have, in weighing the evidence, compared *285 these statements, made before the present contention was joined, with other evidence adduced, and they impress us more than the testimony, often equivocal, given to sustain an interested view. They are to be contrasted with the contention on brief that the "efforts of the petitioners from the beginning were to develop the property as one of the income-producing assets of the real estate rental business * * *." They could not, in truth, develop the Lake property without acquiring the other half interest; yet they let their option thereon lapse. Their position is indeed that if they had title to the other half they might have improved the lot. The bank was never in the business of developing the property, and took the position that it could not join therein. The view that there was here business use of this property seems both belated and out of keeping with the facts involved. We conclude that the facts here do not disclose the use of property in the trade or business of the petitioners within the intendment of section 117 of the Internal Revenue Code. We, therefore, affirm the determination of the Commissioner that the loss was a capital loss, on sale of a capital *286 asset. Decision will be entered for the respondent. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) DEFINTIONS. - As used in this chapter - (1) CAPITAL ASSETS. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * real property used in the trade or business of the taxpayer; * * *↩